UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JODIE M. KELLEY,<br><br>                    Plaintiff,<br><br>    v.<br><br>AMAZON.COM, INC. and AMZN<br>WACS, INC.,<br><br>                    Defendants. | NO:  12-CV-5132-TOR<br><br>ORDER ON CROSS-MOTIONS FOR<br>SUMMARY JUDGMENT |

BEFORE THE COURT is Defendants' Motion for Summary Judgment (ECF No. 18) and Plaintiff's Cross-Motion for Summary Judgment on Failure to Accommodate Claim (ECF No. 47).  These matters were heard with oral argument on November 20, 2013.  Michael B. Love and Matthew Z. Crotty appeared on behalf of the Plaintiff.  Janine C. Blatt appeared on behalf of Defendants.  The Court has reviewed the briefing and the record and files herein, and is fully informed.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 1

BACKGROUND

This is a wrongful termination case.  Plaintiff alleges that her former employer, a subsidiary of Amazon.com, Inc., violated state and federal law by, *inter alia*, failing to accommodate her disabilities and relying upon her requests for medical leave as a reason for terminating her employment.  Defendants have moved for summary judgment on all claims.  Plaintiff has filed a cross-motion for summary judgment on her failure to accommodate claims.  As discussed below, the Court finds that Plaintiff has failed to demonstrate a genuine issue of material fact for trial on any claim.  Defendants are entitled to summary judgment.

FACTS

Plaintiff Jodie Kelley ("Plaintiff") began working for Defendant AMZN WACS, Inc. ("Amazon")[1] in 2006 as a Customer Service Associate ("CSA") in Amazon's call center in Kennewick, Washington.  Her primary responsibility in this position was to assist Amazon.com customers with problems or questions related to their online purchases over the telephone.  Like all Amazon CSAs, Plaintiff's job performance was measured in terms of Expressed Dissatisfaction

---

[1] AMZN WACS, Inc. is a wholly-owned subsidiary of Amazon Fulfillment Services, Inc., which in turn is a wholly-owned subsidiary of Amazon.com, Inc. ECF No. 52 at ¶ 1.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 2

Rate ("EDR"). Somewhat simplified, this metric captured the percentage of a particular CSA's customers whose problems the CSA was unable to resolve.

In February 2008, Plaintiff was promoted to a Customer Service Lead position. In this role, Plaintiff was responsible for coaching and assisting other CSAs in meeting Amazon's performance expectations, monitoring call volumes, assisting with team meetings, helping customers who asked to speak with a manager, and filing escalation requests. In August 2009, Plaintiff voluntarily stepped down from this position for medical reasons and in anticipation of attending cosmetology school. Plaintiff continued to work for Amazon on a part-time basis as a CSA assigned to the "Search and Rescue Team." In that role, Plaintiff's primary responsibility was to handle customer problems and complaints that had not been resolved during the customer's initial contact with a customer service representative.

In October 2009, Plaintiff resumed full-time employment as a CSA on the Search and Rescue Team. Shortly thereafter, Plaintiff's job performance began to decline. In November 2009, Plaintiff was placed on a performance improvement plan after her EDR slightly exceeded the Search and Rescue Team's assigned goal. Plaintiff successfully completed this plan. In July 2010, however, Plaintiff again exceeded her assigned EDR goal and was placed on another performance plan ("July Plan"). Plaintiff failed to meet the requirements of this plan. As a result,

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 3

Plaintiff was issued a verbal warning and placed on another performance plan in August 2010 ("August Plan").

Plaintiff failed to meet the performance expectations outlined in the August Plan. In the weeks that followed, Plaintiff's EDR scores continued to exceed her team's assigned goals. In November 2010, Plaintiff was issued a written warning and placed on a third consecutive performance plan ("November Plan"). Plaintiff was also provided additional training and coaching in an effort to improve her performance. During the course of this remedial training, Plaintiff's supervisor and others noted that Plaintiff "had a problem with her tone while dealing with customers and was not taking enough time with each customer. She came across as unapologetic, distracted, short, uninterested, uncaring and rushed." Jones Decl., ECF No. 19, at ¶ 9.

Despite receiving this additional coaching, Plaintiff failed to meet the requirements of the November Plan. Her EDR scores fell below Amazon's expectations over the next several weeks. Consequently, Plaintiff was placed on a final performance improvement plan in February 2011 ("Final Plan"). Plaintiff was also issued a Final Written Warning advising her that failure to comply with the Final Plan could result in termination. Ultimately, Plaintiff's performance did not improve. When she failed to meet the expectations outlined in the Final Plan, Amazon terminated her employment.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 4

Throughout her tenure at Amazon, Plaintiff experienced frequent migraine headaches and struggled with pain and other symptoms caused by endometriosis.[2] As a result of these conditions, Plaintiff frequently requested medical leave under the Family Medical Leave Act ("FMLA").  Amazon approved each of these requests upon receiving a certification from Plaintiff's physician.  Plaintiff also requested occasional modifications to her assigned work schedule based upon her doctor's recommendation that she not work more than eight hours per day. Amazon approved each of these requests as well.

In the instant lawsuit, Plaintiff does not dispute that her performance was deficient as measured against Amazon's uniform EDR standards.  She contends, however, that Amazon was required to adjust its performance expectations as an accommodation for her disabilities.  Plaintiff further alleges that Amazon's decision to terminate her employment was influenced by her frequent FMLA absences.  Plaintiff has asserted causes of action under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101, *et seq.*, the FMLA, 29 U.S.C. 2601, *et seq.*, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-

---

[2] Endometriosis is a medical condition in which uterine tissue grows outside the female uterus.  Morrison Decl., ECF No. 38, at ¶ 6.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 5

1   2, *et seq.*, and the Washington Law Against Discrimination ("WLAD"), RCW

2   49.60.010, *et seq.*

3                                   DISCUSSION

4          Summary judgment may be granted to a moving party who demonstrates

5   "that there is no genuine dispute as to any material fact and that the movant is

6   entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party

7   bears the initial burden of demonstrating the absence of any genuine issues of

8   material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then

9   shifts to the non-moving party to identify specific genuine issues of material fact

10  which must be decided by a jury.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.

11  242, 256 (1986).  "The mere existence of a scintilla of evidence in support of the

12  plaintiff's position will be insufficient; there must be evidence on which the jury

13  could reasonably find for the plaintiff."  *Id.* at 252.

14         For purposes of summary judgment, a fact is "material" if it might affect the

15  outcome of the suit under the governing law.  *Id.* at 248.  A dispute concerning any

16  such fact is "genuine" only where the evidence is such that a reasonable jury could

17  find in favor of the non-moving party.  *Id.*  In ruling upon a summary judgment

18  motion, a court must construe the facts, as well as all rational inferences therefrom,

19  in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372,

20

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 6

378 (2007).  Only evidence which would be admissible at trial may be considered.  *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002).

### A. Failure to Accommodate Claims (ADA & WLAD)

Both the ADA and the WLAD require an employer to make reasonable accommodations for an employee with a disability.  42 U.S.C. § 12112(b)(5); RCW 49.60.180(1)-(3).  To prevail on a failure to accommodate claim under the ADA, a plaintiff must prove that "(1) she is disabled within the meaning of the ADA; (2) she is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) she suffered an adverse employment action because of her disability."  *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (quotation and citation omitted).  The elements of a failure to accommodate claim under the WLAD are similar.  The plaintiff must prove that (1) she had a sensory, mental, or physical abnormality that substantially limited her ability to perform the job; (2) she was qualified to perform the essential functions of the position; (3) she gave her employer notice of the disability and its accompanying substantial limitations; and (4) upon receiving notice, the employer failed to affirmatively adopt measures that were both available and medically necessary to accommodate the disability.  *Riehl v. Foodmaker, Inc.*, 152 Wash.2d 138, 145 (2004).  Failure to accommodate claims are not analyzed under the familiar *McDonnell Douglas* burden shifting framework because liability does not

"turn on the employer's intent or actual motive." *Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004).

In the instant case, Plaintiff alleges that Amazon violated the ADA and the WLAD by failing to participate in the "interactive process" upon learning of her disabilities. As a result of this failure, Plaintiff contends, Amazon never learned that her deficient job performance—which Amazon purportedly attributed to her inability to speak to customers in an appropriate tone of voice—was caused by her migraines and endometriosis. Upon discovering this causal connection, Plaintiff argues, Amazon would have been required to explore additional accommodations before terminating her employment. Since the parties have not identified any relevant distinctions between the ADA and the WLAD for purposes of the instant cross-motions, the Court will address Plaintiff's state and federal claims together.

1. Notice of the Need for Accommodation

Amazon has moved for summary judgment on two separate grounds. First, Amazon argues that Plaintiff's claims fail as a matter of law because Plaintiff never mentioned a possible connection between her deficient job performance and her disabilities. ECF No. 18 at 10-11; ECF No. 51 at 5-7. Because Plaintiff never explained that her difficulties speaking to customers in an appropriate tone of voice was related to her migraines and endometriosis, Amazon contends, its obligation to reasonably accommodate this limitation was never triggered.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 8

Plaintiff concedes that she did not specifically inform Amazon that her performance issues were related to her disabilities.  Nevertheless, Plaintiff insists that Amazon violated the ADA and the WLAD by refusing to participate in the "interactive process."  The force of this argument is that Amazon would have discovered a causal connection had it simply "sat down" with her to explore the extent of her disability-related limitations.  Upon discovering such a connection, Plaintiff contends, Amazon would have been required to grant her a performance-related accommodation.  ECF No. 58 at 7.

Plaintiff's argument is unavailing.  As a threshold matter, the evidence of a causal relationship between Plaintiff's deficient performance and her disabilities is entirely speculative.  Aside from Plaintiff's self-serving "belief" that the two were connected, *see* Kelley Decl., ECF No. 33, at ¶ 14, the only evidence to potentially support such a finding is the conclusory opinion of Plaintiff's gynecologist that the two *might* be related:

> [The symptoms caused by Plaintiff's migraines and endometriosis] have an effect on Ms. Kelley's interaction with others, whether in person or over the telephone.  When experiencing these symptoms, one would experience different inflections in their voice, and come across with a different "tone."  Ms. Kelley would experience at times a frustration which *might* come across in how she was dealing with customers.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 9

Morrison Decl., ECF No. 38, at ¶ 11 (emphasis added).  Although Amazon has not raised the issue, the Court has serious doubts about whether this opinion meets the admissibility requirements of Federal Rule of Evidence 702.

Moreover, there is no documentation of any potential for impaired job performance in Plaintiff's medical records.  As a result, there is little to support Plaintiff's contention that Amazon would have discovered a connection by participating in the "interactive process."  *See Riehl*, 152 Wash.2d at 147 (no duty to accommodate "where an employee determines he or she needs accommodation for a disability but fails to provide a medical nexus between the disability and the need for accommodation").  At bottom, there is insufficient evidence to support a finding that Plaintiff's deficient job performance was caused by her disabilities—or that Amazon could have discovered such a connection by "sitting down" with her to discuss her disabilities.

Assuming for the sake of argument that Plaintiff could prove a causal connection, her argument still fails.  It is undisputed that Plaintiff never notified Amazon of a possible connection between her performance problems and her disabilities.  As a result, Amazon had no reason to know that a performance-related accommodation may have been in order.  It is further undisputed that Plaintiff had multiple opportunities to discuss a possible connection with Amazon while she was

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 10

being counseled about her deficient performance.  This is not a case in which the employee had an insufficient opportunity to request a reasonable accommodation.

Contrary to Plaintiff's assertions, Amazon was not obligated to affirmatively explore a connection between her performance problems and her disabilities.  The agency charged with enforcing the ADA, the Equal Employment Opportunity Commission ("EEOC"), has published direct guidance on this issue:

**Should an employer mention an employee's disability during a discussion about a performance or conduct problem if the employee does not do so?**

Generally, it is inappropriate for the employer to focus discussion about a performance or conduct problem on an employee's disability. The point of the employer's comments should be a clear explanation of the employee's performance deficiencies or misconduct and what he expects the employee to do to improve.  Moreover, emphasizing the disability risks distracting from the focus on performance or conduct, and in some cases could result in a claim under the ADA that the employer "regarded" (or treated) the individual as having a disability.

- Practical Guidance: It is generally preferable that the employee initiate any discussion on the role of the disability.  Ideally, employers should discuss problems before they become too serious in order to give the employee an opportunity as soon as possible to address the employer's concerns.

- Practical Guidance: An employee who is on notice about a performance or conduct problem and who believes the disability is contributing to the problem should evaluate whether a reasonable accommodation would be helpful.  An employee should not assume that an employer knows about a disability based on certain behaviors or symptoms.  *Nor should an employee expect an employer to raise the issue of the possible need for reasonable accommodation, even when a disability is known or obvious.*

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 11

U.S. Equal Emp't Opportunity Comm'n, *The Americans With Disabilities Act: Applying Performance and Conduct Standards to Employees with Disabilities*, available at http://www.eeoc.gov/facts/performance-conduct.html (italicized emphasis added).

This authority establishes that an employee may not simply inform her employer that she suffers from a disability and assume that the employer will discover (and subsequently accommodate) each and every limitation caused by the disability. To trigger the employer's duty to engage in the "interactive process," the employee must inform the employer of both the disability *and* the resulting limitations. As the Fifth Circuit explained in an analogous case,

> For purposes of proving ADA discrimination, it is important to distinguish between an employer's knowledge of an employee's disability versus an employer's knowledge of any *limitations* experienced by the employee as a result of that disability. This distinction is important because the ADA requires employers to reasonably accommodate limitations, not disabilities.
>
> *          *          *
>
> [W]hile a given disability may limit one employee (and therefore necessitate a reasonable accommodation), it may not limit another. For this reason, the ADA does not require an employer to assume that an employee with a disability suffers from a limitation. In fact, better public policy dictates the opposite presumption: that disabled employees are not limited in their abilities to adequately perform their jobs. . . . *Accordingly, it is incumbent upon the ADA plaintiff to assert not only a disability, but also any limitation resulting therefrom.*

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 12

1    *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996) (emphasis

2    added); *see also Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046-47 (6th

3    Cir. 1998) ("The employer is not required to speculate as to the extent of the

4    employee's disability or the employee's need or desire for an accommodation.");

5    *Davis v. Microsoft Corp.*, 149 Wash.2d 521, 532 (2003) (employer's duty to

6    provide reasonable accommodation triggered by "notice of the abnormality *and its*

7    *accompanying substantial limitations*") (emphasis added).  Given that Plaintiff did

8    not specifically advise Amazon of a possible connection between her deficient

9    performance and her disabilities, Amazon was not required to accommodate

10   Plaintiff as a matter of law.

11        At oral argument, Plaintiff relied heavily on *Kimbro v. Atlantic Richfield*

12   *Co.*, 889 F.2d 869 (9th Cir. 1989) for the proposition that an employer must

13   affirmatively investigate potential work-related limitations upon learning of an

14   employee's disability.  *Kimbro* does not even remotely support this proposition.

15   The primary issue in *Kimbro* was whether an employer could be charged with

16   knowledge that an employee required an accommodation.  The trial court record

17   established that the employee's supervisor was aware of the disability—and the

18   fact that it occasionally caused the employee to miss work.  After the employee

19   was fired for excessive absenteeism, he sued for failure to accommodate.  The

20   employer defended on the ground that it lacked knowledge of the employee's need

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 13

for an accommodation because the employee's supervisor had failed to inform

upper management of the disability and its impact on the employee's attendance.

The Ninth Circuit rejected this argument, holding that the employer was "bound by

[the supervisor's] knowledge of [the employee's] medical condition." *Kimbro*,

889 F.2d at 876.  "Because [management] was . . . on notice of [the employee's]

condition as a result of [his] supervisor's full awareness of [the] condition," the

Court reasoned, the employer "must be held responsible for any failure to attempt a

reasonable accommodation." *Id.* at 874.

*Kimbro* does not hold that employers must investigate whether work-related

problems are causally related to a disability.  Instead, *Kimbro* simply holds that

employers must explore reasonable accommodations *upon receiving notice* of a

connection between a work-related problem and a disability.  The interactive

process did not begin here because Plaintiff admittedly never notified Amazon of a

possible connection between her repeated performance problems and her

disabilities.

2.  Ability to Perform the Essential Functions of the Position

Amazon's second argument on summary judgment is that Plaintiff was not

capable of performing an essential function of her job: meeting Amazon's

customer satisfaction targets.  The burden of establishing that this function is

essential to the position "lies uniquely with [Amazon]."  *Bates v. United Parcel*

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 14

*Svc., Inc.*, 511 F.3d 974, 991 (9th Cir. 2007) (en banc) (quotation and citation omitted).  To satisfy this burden, Amazon must produce admissible evidence which, if credited by the trier of fact, would support a finding that the function at issue is essential.  *Samper*, 675 F.3d at 1237.  Relevant evidence includes, but is not limited to: Amazon's judgment as to which functions are essential; written job descriptions prepared before advertising or interviewing applicants for the job; the amount of time spent on the job performing the function; the work experience of past incumbents in the job; and the current work experience of incumbents in similar jobs.  29 C.F.R. § 1630.2(n)(3).

Amazon has successfully established that meeting assigned EDR targets is an essential function of the Search and Rescue CSA position.  Amazon strives to be "the world's most customer-centric company."  Defs.' Statement of Material Facts, ECF No. 25, at ¶¶ 10.  Amazon's customer service associates are critical to achieving that mission.  Defs.' Statement of Material Facts, ECF No. 25, at ¶¶ 11.  As a result, Amazon devotes significant resources to training CSAs and to ensuring that they provide satisfactory customer support.  Defs.' Statement of Material Facts, ECF No. 25, at ¶ 12.  Amazon assigns CSAs with particularly strong customer service skills to the Search and Rescue Team, which is responsible for handling escalated customer issues that may require more research, stronger

1  knowledge of policy and systems, and more advanced problem-solving skills than

2  are required to resolve routine issues.  Zabriskie Decl., ECF No. 24, at ¶ 2.

3       One of the methods by which Amazon measures customer satisfaction is by

4  asking each customer whether his or her problem was resolved with the CSA's

5  assistance.  Defs.' Statement of Material Facts, ECF No. 25, at ¶ 12.  For each

6  CSA, Amazon tracks the number of "no" responses in relation to the number of

7  customer contacts—the Expressed Dissatisfaction Rate.  Defs.' Statement of

8  Material Facts, ECF No. 25, at ¶¶ 13-14.  CSAs who fail to meet their assigned

9  EDR goals are placed on performance improvement plans and subjected to

10 progressive discipline.  Defs.' Statement of Material Facts, ECF No. 25, at ¶¶ 17-

11 18.  CSAs whose performance does not improve within a specified time are

12 ultimately terminated.  Defs.' Statement of Material Facts, ECF No. 25, at ¶ 18.

13      From this undisputed evidence, a rational jury could only find that meeting

14 EDR targets is an essential function of the CSA position.  Indeed, maintaining a

15 high level of customer satisfaction would seem to be *the* essential function of this

16 customer service-oriented position.  This is particularly true of CSA positions on

17 the "Search and Rescue Team," which is tasked with "going the extra mile" to

18 restore customer satisfaction after prior attempts have failed.

19      Because Amazon has established that meeting EDR targets is an essential

20 function of the CSA position, the burden falls to Plaintiff to demonstrate that she

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 16

1  was able to perform this function with or without a reasonable accommodation.

2  *Samper*, 675 F.3d at 1237.  Having reviewed the entire record, the Court finds no

3  evidence to support a finding that Plaintiff was capable of meeting her EDR targets

4  *without* a reasonable accommodation.  As a threshold matter, Plaintiff's primary

5  theory of liability is inconsistent with such a finding.  The essence of Plaintiff's

6  claims is that Amazon should have adjusted its uniform performance expectations

7  to account for her disabilities.  *See* ECF No. 30 at 12 ("[Amazon's] application of

8  an across the board 'standard' EDR goal, its 'standard' disciplinary policy for not

9  meeting the goal, and its 'identical application and treatment' to both non-disabled

10  and disabled employee(s), is evidence of its utter failure to accommodate Ms.

11  Kelley's disabilities."); ECF No. 30 at 10 (arguing that holding disabled and non-

12  disabled employees to the same EDR expectations creates a "Catch-22" for

13  disabled employees); ECF No. 47 at 14 ("The use of a strict across-the-board,

14  subjective performance goal policy, where the employee is suffering from

15  disabilities that may inherently result in unsatisfactory scores, is contrary to

16  law[.]").  Under this theory of the case, it would make little sense to allow a jury to

17  consider Plaintiff's ability to meet Amazon's uniform EDR targets without an

18  accommodation; if Plaintiff was capable of meeting her EDR targets in the first

19  place, there would be no need for Amazon to grant her an exemption.

20

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 17

1     In any event, it is undisputed that Plaintiff habitually failed to meet her EDR

2     targets from July 2010 through March 2011.  *See* Defs.' Statement of Material

3     Facts, ECF No. 25, at ¶¶ 24-43.  In view of this uncontested evidence, there are no

4     genuine issues of fact concerning Plaintiff's ability to meet her EDR targets

5     without a reasonable accommodation.  The fact that Plaintiff apparently met her

6     performance goals in prior years does not warrant a different conclusion.  *See Mole*

7     *v. Buckhorn Rubber Prods., Inc.*, 165 F.3d 1212, 1217 (8th Cir. 1999) ("An ADA

8     plaintiff may not rely upon past performance to establish that she is a qualified

9     individual *without accommodation* when the employer has produced undisputed

10    evidence of diminished or deteriorated abilities.") (emphasis in original).

11    The relevant question, then, is whether Plaintiff could have met her assigned

12    EDR targets *with* a reasonable accommodation.  As discussed above, Plaintiff's

13    primary theory of liability is that Amazon should have accommodated her by

14    assigning her more lenient EDR targets.  Stated more plainly, Plaintiff contends

15    that Amazon should have tolerated a higher rate of dissatisfaction among her

16    customers to account for the fact that she sometimes spoke to customers in an

17    unpleasant tone of voice due to her migraines and endometriosis.  *See, e.g.*, Kelley

18    Decl., ECF No. 33, at ¶ 14 ("I believe my disabling conditions may have affected

19    my "tone" at times in speaking with Amazon customers over the telephone[.]");

20    ECF No. 30 at 18 ("Ms. Kelley's 'tone' was symptomatic of her endometriosis and

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 18

migraine headaches based upon the pain and discomfort of her disabilities."); ECF No. 30 at 19 ("Ms. Kelley's 'tone' was a consequence of her disabilities, 'which the law protects as part and parcel of her disability.'") (citation omitted).  Amazon, for its part, maintains that it was not required to adjust its uniform performance expectations as a matter of law.  ECF No. 18 at 11-12; ECF No. 51 at 8-10.

Amazon has the better of the argument.  The ADA and the WLAD require employers to make *reasonable* accommodations for disabled employees.  What constitutes a reasonable accommodation turns on the facts and circumstances of each case.  *Wong v. Regents of Univ. of Calif.*, 192 F.3d 807, 819 (9th Cir. 1999). As a general proposition, however, an accommodation that requires an employer to lower a uniform performance standard for a particular employee is not reasonable. Once again, the Court finds the EEOC's guidance instructive:

> There are several modifications or adjustments that are not considered forms of reasonable accommodation.  An employer does not have to eliminate an essential function, *i.e.*, a fundamental duty of the position. This is because a person with a disability who is unable to perform the essential functions, with or without reasonable accommodation, is not a "qualified" individual with a disability within the meaning of the ADA. *Nor is an employer required to lower production standards—whether qualitative or quantitative—that are applied uniformly to employees with and without disabilities.*  However, an employer may have to provide reasonable accommodation to enable an employee with a disability to *meet* the production standard.  While an employer is not required to eliminate an essential function or lower a production standard, it may do so if it wishes.

*Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act*, EEOC Notice No. 915.002, October 17, 2002, available at http://www.eeoc.gov/policy/docs/accommodation.html (emphasis added); *see also Applying Performance and Conduct Standards to Employees with Disabilities, supra* ("[Question:] May an employer apply the same quantitative and qualitative requirements for performance of essential functions to an employee with a disability that it applies to employees without disabilities?  [Answer:]  Yes.  An employee with a disability must meet the same production standards, whether quantitative or qualitative, as a non-disabled employee in the same job.  Lowering or changing a production standard because an employee cannot meet it due to a disability is not considered a reasonable accommodation.  However, a reasonable accommodation may be required to assist an employee in meeting a specific production standard."); 29 C.F.R. Pt. 1630, App. § 1630.2(n) ("It is important to note that the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards, whether qualitative or quantitative, nor to require employers to lower such standards.").

Although this guidance is not binding authority, it appears to have been followed almost universally by courts that have had occasion to apply it.  *See, e.g.*, *E.E.O.C. v. Picture People, Inc.*, 684 F.3d 981, 986 (10th Cir. 2012) ("The [ADA's] essential function analysis is not intended to second guess the employer

or to require it to lower company standards.") (quotation and citation omitted); *Mulloy v. Acushnet Co.*, 460 F.3d 141, 147 (1st Cir. 2006) (same); *Koerts v. MCI Telecomm. Corp.*, 1997 WL 30987 at *11 (N.D. Ill. 1997) (unpublished) ("MCI was not required to ignore its legitimate performance expectations or to disregard its policies and practices with respect to the use of Performance Plans simply because Koerts may have suffered from a disability; rather, MCI merely was obligated to afford Koerts the same (or equivalent) opportunities to succeed as were afforded her nondisabled counterparts."); *Ciullo v. Yellow Book, USA, Inc.*, 2012 WL 2676080 at *12 (E.D. N.Y. 2012) (unpublished) ("[T]he core functions of the [sales] position included securing new business and meeting certain revenue goals.  Yellow Book, therefore, was not required to provide more accounts and lower sales quotas to [a disabled] employee who was not able to meet those standards."); *E.E.O.C. v. Health Foods Assocs., Inc.*, 2006 WL 286 3231 at *4-5 (W.D. Okla. 2006) (unpublished) (grocery store not required to exempt prospective employee with Down Syndrome from uniform requirement that all employees be capable of assisting customers).  Based upon this guidance and the weight of authority applying it, the Court concludes that Amazon was not required to grant Plaintiff more lenient EDR targets as a matter of law.

Plaintiff contends that *U.S. Airways Inc. v. Barnett*, 535 U.S. 391 (2002), *Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087 (9th Cir. 2007), and *Riehl v.*

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 21

*Foodmaker, Inc.*, 152 Wash.2d 138 (2004), dictate a different result.  The Court is not persuaded.  *Barnett* deals with an exception to the reasonable accommodation requirement for accommodations that would pose an "undue hardship" on the employer.  535 U.S. at 396 (applying 42 U.S.C. § 12112(b)(5)(A)).  The portion of the case cited in Plaintiff's briefing holds that an accommodation which allows a disabled employee to "violate a rule that others must obey" does not create a *per se* undue hardship for the employer.  *Id.* at 398.  This holding is inapposite to this case, as Amazon has not invoked the ADA's undue hardship exemption.  Instead, Amazon has defended on the ground that Plaintiff's requested accommodation is unreasonable in the first instance.

Plaintiff's reliance on *Gambini* is similarly misplaced.  There, the Ninth Circuit held that an employer may not terminate a disabled employee for "conduct resulting from" the employee's disability because such conduct is part and parcel of the disability itself.  *Gambini*, 486 F.3d at 1093.  The cited portion of the case suggests that, as a practical consequence of this rule, employers will occasionally be required to treat disabled employees more favorably than non-disabled employees when enforcing company-wide policies.  *See id.* at 1095 ("Unlike other types of discrimination where identical treatment is the gold standard, identical treatment is often not equal treatment with respect to disability discrimination.").

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 22

1    Significantly, however, the prohibition on terminating an employee for

2    "conduct resulting from" a disability does not apply to conduct that materially

3    impairs the employee's job performance.  *Id.*  Under both the ADA and the

4    WLAD, *Gambini* explains, the employee must still establish that he or she is

5    capable of performing the essential functions of the job with or without a

6    reasonable accommodation.  *Id.*; *accord Clarke v. Shoreline Sch. Dist. No. 412*,

7    106 Wash.2d 102, 118 (1986) (employer "may refuse to hire or may discharge a

8    [disabled] person, if the [disability] prevents the 'proper performance' of the job").

9    Since Plaintiff has failed to make that showing here, *Gambini*'s discussion of the

10   need for employers to occasionally treat disabled employees more favorably than

11   non-disabled employees does not apply.

12    Nor does *Riehl* support Plaintiff's argument.  Like *Gambini*, *Riehl* holds that

13   an employer may not terminate a disabled employee for "conduct resulting from"

14   the disability.  152 Wash.2d at 152.  According to Plaintiff, the case stands for the

15   proposition that an employer may not terminate an employee for deficient job

16   performance when the deficiency "results from" the employee's disability.  ECF

17   No. 30 at 17-18.  At first glance, certain language in the opinion appears to support

18   this contention: "[E]ven if Riehl's performance decreased, this may have been

19   based on his disability.  Conduct resulting from the disability (e.g., decrease in

20   performance) is part of the disability and not a [permissible] basis for termination."

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 23

1   *Id.* (citing *Humphrey v. Mem'l Hosp. Ass'n*, 239 F.3d 1128, 1139-40 (9th Cir.

2   2001)).

3          On closer inspection, however, *Riehl* is distinguishable.  Critically, there was

4   no dispute in *Riehl* that the employee was capable of performing the essential

5   functions of his position.  *Id.* at 145-46.  The only disputed issue was whether the

6   employee had been terminated for poor performance on *non*-essential functions of

7   his position.  *Id.* at 151-52.  Thus, the holding in *Riehl* does not apply to cases in

8   which the disabled employee has performed deficiently on an essential function of

9   the position.  Once again, the plaintiff in such cases must still make a threshold

10  showing that he or she can perform the essential functions of the position with or

11  without an accommodation.  *Gambini*, 486 F.3d at 1095.

12         As an alternative theory of accommodation, Plaintiff suggests that Amazon

13  could have reassigned her to either the "Chat Team," which communicates with

14  customers via the internet rather than over the telephone, or the "Kindle Team,"

15  which handles more routine customer problems than the Search and Rescue Team

16  to which she was assigned.  ECF No. 47 at 16.  Neither argument is persuasive.

17  First, there were no vacant positions on the Chat Team at or around the time of

18  Plaintiff's termination, *see* Zabriskie Decl., ECF No. 54, at ¶ 4, and Amazon was

19  not required to create one for her.  *Wellington v. Lyon Cnty. Sch. Dist.*, 187 F.3d

20  1150, 1155 (9th Cir. 1999); *Riehl*, 152 Wash.2d at 146 n. 2 (2004).  Second, an

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 24

1    assignment to the Chat Team still would have required Plaintiff to interact with

2    customers over the phone, albeit on a less frequent basis.  Zabriskie Decl., ECF

3    No. 54, at ¶ 5.  Thus, even if a position on the Chat Team had been available, a

4    reassignment would not have solved the problem of Plaintiff speaking to customers

5    in an inappropriate tone of voice.

6        Finally, a reassignment to the Kindle Team would not have made it easier

7    for Plaintiff to meet her weekly EDR targets.  Although the Kindle Team handles

8    more routine problems than the Search and Rescue team, CSAs assigned to this

9    team are given *more demanding* EDR targets than CSAs assigned to Search and

10   Rescue (presumably to account for the fact that they are more likely to be able to

11   resolve an average customer's problem).  Myers Dep., ECF No. 31-7, at Tr. 30.

12   Plaintiff has produced no evidence from which a rational jury could find that she

13   was capable of meeting an even more demanding EDR target on a different team.

14       In sum, Plaintiff has failed to establish that she was capable of performing

15   an essential function of the Search and Rescue CSA position—meeting her

16   assigned EDR targets—with or without an accommodation.  As a matter of law,

17   Amazon was not required to tolerate a higher level of dissatisfaction among

18   Plaintiff's customers, as such an accommodation would have effectively excused

19   Plaintiff from performing an essential function of her job.  Nor was Amazon

20   required to reassign Plaintiff to a different customer service team, as there is no

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 25

1   evidence that such a reassignment would have effectively accommodated

2   Plaintiff's disability-related limitations.  Amazon is entitled to summary judgment

3   on Plaintiff's failure to accommodate claims on these alternative grounds as well.

4   **B. Disparate Treatment Claims (ADA & WLAD)**

5          In addition to her failure to accommodate claims, Plaintiff has asserted

6   claims under the ADA and the WLAD for disparate treatment on the basis of a

7   disability.  Unlike claims for failure to accommodate, disparate treatment claims

8   are analyzed under the familiar *McDonnell Douglas* burden shifting framework.

9   *Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 n. 3 (2003); *Callahan v. Walla Walla*

10  *Hous. Auth.*, 126 Wash. App. 812, 819 (2005).  Under *McDonnell Douglas*, a

11  plaintiff alleging disparate treatment must first establish a prima facie case of

12  discrimination.  The burden then shifts to the employer to articulate a legitimate,

13  non-discriminatory reason for taking the challenged action.  This is a burden of

14  production rather than a burden of persuasion.  Provided that the employer can

15  articulate such a reason, the burden then shifts back to the plaintiff to demonstrate

16  that the proffered reason was a mere pretext for unlawful discrimination.  "If the

17  plaintiff fails to establish a prima facie case or to rebut the defendant's alternative

18  explanation for the adverse action, the defendant is entitled to summary judgment.

19  If the evidence could support reasonable inferences either way, the case should go

20  to trial."  *Callahan*, 126 Wash. App. at 819.

To state a prima facie case of disparate treatment on the basis of a disability under the ADA, a plaintiff must establish "(1) that [she] is a disabled person within the meaning of the ADA; (2) that [she] is qualified, that is, with or without reasonable accommodation . . . to perform the essential functions of the job; and (3) that the employer terminated [her] because of [her] disability. *Kennedy v. Applause, Inc.*, 90 F.3d 1447, 1481 (9th Cir. 1996) (citations and footnote omitted). The WLAD requires a similar prima facie showing; the plaintiff must demonstrate that (1) she was disabled; (2) she was subject to an adverse employment action; (3) she was doing satisfactory work; and (4) she was discharged under circumstances that raise a reasonable inference of unlawful discrimination. *Anica v. Wal-Mart Stores, Inc.*, 120 Wash. App. 481, 488 (2004).

Plaintiff's disparate treatment claims are grounded in the same theory of liability as her failure to accommodate claims: that she was wrongfully terminated due to her inability to speak to customers in an appropriate tone of voice. ECF No. 30 at 16-19. These claims fail for the same reasons discussed above. To whatever extent Plaintiff's inability to speak to customers in an appropriate tone of voice was caused by her migraines and endometriosis, Plaintiff was not exempt from being disciplined for poor job performance. Assuming for the sake of argument that Amazon had *known* of such a connection, it was still entitled to terminate Plaintiff's employment since her disability-related limitation rendered her

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 27

1    incapable of performing an essential function of her job. *Gambini*, 486 F.3d at

2    1095; *Clarke*, 106 Wash.2d at 118. Amazon is entitled to summary judgment on

3    these claims.

4    **C. FMLA Claim**

5         Plaintiff also alleges that her termination violated the FMLA. The FMLA

6    prohibits an employer from, *inter alia*, taking adverse employment action as a

7    result of an employee taking FMLA leave. 29 U.S.C. § 2615(a)(1); 29 C.F.R. §

8    825.220(c). This prohibition is designed to remove a potential obstacle to an

9    employee taking FMLA leave, as "[e]mployees are, understandably, less likely to

10   exercise their FMLA leave rights if they can expect to be fired or otherwise

11   disciplined for doing so." *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124

12   (9th Cir. 2001). Employers who violate this prohibition are liable for "interfering"

13   with the exercise of FMLA rights within the meaning of § 2615(a)(1). *Id.* To

14   prevail on an FMLA interference claim, a plaintiff must prove by a preponderance

15   of the evidence that her FMLA leave was considered as a "negative factor" in the

16   employer's termination decision. *Id.* at 1125. The *McDonnell Douglas* burden

17   shifting framework does not apply to such claims; the plaintiff must simply

18   produce either direct or circumstantial evidence of unlawful interference. *Id.*

19        Plaintiff has advanced two separate theories about how Amazon used her

20   FMLA leave as a "negative factor" in its termination decision. First, Plaintiff

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 28

1    argues that Amazon gave her poor performance reviews in order to rid itself of an

2    employee who took excessive FMLA leave.  ECF No. 30 at 13-15.  Given that her

3    reviews were grounded in Amazon's inherently "subjective" evaluation of her tone

4    of voice, Plaintiff argues, a jury could reasonably infer that Amazon deliberately

5    rated her unfairly to expedite her departure from the company.  ECF No. 30 at 14

6    (citing *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1137 (9th Cir. 2003)).

7          This argument fails because it patently mischaracterizes the reason for

8    Plaintiff's termination.  As Amazon correctly notes, Plaintiff was not terminated

9    based upon its subjective assessment of her tone of voice.  Instead, Plaintiff was

10   terminated because she consistently failed to meet her EDR targets.  EDR is an

11   *objective* performance evaluation metric; it measures customer dissatisfaction by

12   dividing the number of "No" responses to the question, "Did we solve your

13   problem?" by total number of customer contacts.  Jones Decl., ECF No. 19, at ¶ 4.

14   It is true that Amazon identified Plaintiff's "tone" as a factor that may have

15   contributed to her unsatisfactory EDR scores.  Nevertheless, there is no evidence

16   that Amazon used its assessment of Plaintiff's tone as a pretext for giving her poor

17   reviews and terminating her employment.  To the contrary, the record reflects that

18   Amazon invested significant time and resources coaching Plaintiff on how to

19   improve her tone of voice and overall attitude toward her customers.  When these

20   efforts did not translate to satisfactory performance—as rated objectively by

Plaintiff's customers themselves—Amazon terminated her employment.  There is simply no evidence from which a rational jury could find that Amazon sabotaged Plaintiff's performance reviews with the intent to retaliate against Plaintiff for taking excessive FMLA leave.  *Cf. Xin Liu*, 347 F.3d at 1137 (jury entitled to draw an inference of impermissible interference from low ratings on "soft skills" that cannot be taught, such as "being upbeat").

Second, Plaintiff argues that a jury could draw an inference of unlawful interference from the timing of her FMLA leave in relation to her termination. ECF No. 30 at 15-16.  While a "close temporal proximity" between an employee taking leave and being terminated can sometimes support an inference of unlawful interference, *see Xin Liu*, 347 F.3d at 1137, this is not such a case.  First, it is undisputed that Amazon granted each and every one of Plaintiff's FMLA leave requests from 2008 to 2011.  Defs.' Statement of Material Facts, ECF No. 25, at ¶¶ 53-56.  There is no indication that Amazon ever balked at these requests or encouraged Plaintiff to reduce the frequency of her FMLA leave.  *Cf. Xin Liu*, 347 F.3d at 1134 (supervisor "repeatedly" denied employee's proper FMLA leave requests and also "pressured [her] to reduce her leave time, thus discouraging her from using her FMLA leave").

Second, any inference of interference that could be drawn from the timing of Plaintiff's termination is severely undermined by her repeated failure to meet her

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 30

1   EDR targets in the months prior to her termination.  Plaintiff was initially placed

2   on a performance improvement plan in July 2010 ("July Plan") after failing to meet

3   her EDR target over the prior six weeks.  Defs.' Statement of Material Facts, ECF

4   No. 25 at ¶ 24.  When she failed to meet the requirements of the July Plan, Plaintiff

5   was placed on a second plan in August ("August Plan").  Defs.' Statement of

6   Material Facts, ECF No. 25 at ¶ 25.  When Plaintiff failed to meet the requirements

7   of the August Plan, her new supervisor placed her on a third plan in November

8   ("November Plan").  Defs.' Statement of Material Facts, ECF No. 25 at ¶¶ 26, 30.

9   When Plaintiff failed to meet the requirements of *that* plan, Amazon began

10  providing her with intensive remedial training and coaching.  Defs.' Statement of

11  Material Facts, ECF No. 25 at ¶¶ 32-33.  Despite receiving this extra coaching,

12  Plaintiff continued to fall short of her EDR targets.  Defs.' Statement of Material

13  Facts, ECF No. 25 at ¶ 37.  As a result, Plaintiff was placed on a fourth and final

14  plan in February 2011 ("Final Plan").  Defs.' Statement of Material Facts, ECF No.

15  25 at ¶ 37.  Amazon informed Plaintiff in writing that failure to comply with the

16  Final Plan could result in termination.  Defs.' Statement of Material Facts, ECF

17  No. 25 at ¶ 38.  When Plaintiff failed to meet the requirements of the Final Plan,

18  she was terminated.  Defs.' Statement of Material Facts, ECF No. 25 at ¶ 42.  In

19  view of this undisputed evidence, no rational jury could find that the timing of

20

1    Plaintiff's termination was related to her requests for FMLA leave.  Accordingly,

2    Amazon is entitled to summary judgment on this claim.

3        **D. "Sex-Plus" Discrimination Claims (Title VII and WLAD)**

4        Plaintiff has asserted "sex-plus" discrimination claims under Title VII and

5    the WLAD, alleging that Amazon discriminated against her on the basis of her

6    status as a female caregiver.  ECF No. 30 at 20.  Sex-plus discrimination entails

7    "discrimination based on sex plus another facially neutral factor."  *Wambheim v.*

8    *J.C. Penney Co., Inc.*, 642 F.2d 362, 365 (9th Cir. 1981).  To prevail on a sex-plus

9    claim, the plaintiff must prove that the employer "applied a requirement to one sex

10   but not the other, and then discriminated based on that requirement."  *McBride v.*

11   *Peak Wellness Ctr., Inc.*, 688 F.3d 698, 711 (10th Cir. 2012) (citation omitted).

12       A claim for sex-plus discrimination was first recognized by the Supreme

13   Court in *Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971).  There, a female

14   job applicant brought a Title VII claim alleging wrongful denial of employment on

15   the basis of gender.  *Phillips*, 400 U.S. at 543.  The crux of the plaintiff's allegation

16   was that the prospective employer refused to hire women with young children, but

17   routinely hired men with young children.  *Id.*  Because the evidence proved that the

18   employer hired women at a higher rate than men, however, the plaintiff could not

19   establish discrimination solely on the basis of her gender.  *Id.*  Reversing a grant of

20   summary judgment for the employer, the Court held that the employer had

potentially violated Title VII by implementing different hiring policies for women
and men depending upon whether they were parents of young children.  *Id.* at 544.
Concurring in the *per curiam* opinion, Justice Marshall reasoned that Title VII was
designed to "prevent employers from refusing to hire an individual based on
stereotyped characterizations of the sexes," and that, as a result, "ancient canards"
about a woman's proper role in society could not serve as a basis for restricting
equal employment opportunity.  *Id.* at 545 (Marshall, J., concurring) (internal
quotation and citation omitted).

In the instant case, Plaintiff contends that Amazon engaged in sex-plus
discrimination by (1) refusing her requests for a Monday through Friday work
schedule so that she could care for her children on weekends; and (2) "den[ying]
her a promotion for which she was qualified and award[ing] it to a woman without
children."  ECF No. 30 at 20.  These allegations fail as a matter of law.  With
regard to the scheduling issue, there is no evidence that Amazon treated male
employees with childcare responsibilities more favorably than similarly-situated
female employees.  To the contrary, it is undisputed that Amazon does not take
childcare responsibilities into account for any employee—female or male—when
assigning shifts.  Zabriskie Decl., ECF No. 24, at ¶ 14.  This practice does not
violate Title VII.  *Enforcement Guidance: Unlawful Disparate Treatment of
Workers with Caregiving Responsibilities*, EEOC Notice No. 915.002, May 23,

2007, available at http://www.eeoc.gov/policy/docs/caregiving.html ("Title VII does not prohibit discrimination based solely on parental or other caregiver status, so an employer does not generally violate Title VII's disparate treatment proscription if, for example, it treats working mothers and working fathers in a similar unfavorable (or favorable) manner as compared to childless workers.").

Similarly, there is no evidence that Plaintiff was denied a promotion to a leadership position on the basis of her childcare responsibilities. The fact that the employee who was promoted over Plaintiff did not have children is insufficient, standing alone, to raise an inference of discrimination. Such an inference becomes even more implausible in view of the frank assessment of Plaintiff's qualifications for the position offered by Plaintiff's manager at the time. *See* Myers Decl., ECF No. 20-2 ("While Jodie works well to resolve issues she isn't always a team player. She will spread gossip and not work toward creating a positive team environment.").

In any event, there is no evidence that a male employee was promoted over Plaintiff. An employee alleging sex-plus discrimination must establish that employees of the *opposite gender* were treated more favorably on the basis of a gender-neutral "plus" factor. *Wambheim*, 642 F.2d at 365. There is no evidence to support such a finding here, as a female employee was promoted over Plaintiff. Indeed, Plaintiff appears to have ignored the "sex" component of a sex-plus

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 34

discrimination claim altogether.  Accordingly, Amazon is entitled to summary

judgment on these claims.

**IT IS HEREBY ORDERED:**

    1.  Defendants' Motion for Summary Judgment (ECF No. 18) is

        **GRANTED**.

    2.  Plaintiff's Cross-Motion for Summary Judgment (ECF No. 47) is

        **DENIED**.

    The District Court Executive is hereby directed to enter this Order, provide

copies to counsel, enter **JUDGMENT** for Defendants on all claims, and **CLOSE**

the file.

    **DATED** November 21, 2013.

THOMAS O. RICE
United States District Judge

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ~ 35